UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------x
                                                         :
DAVID THOMAS DE MARCO                                    :           3:10 CV 1151 (JBA)
                                                         :
V.                                                       :
                                                         :
MICHAEL J. ASTRUE,                                       :
COMMISSIONER OF SOCIAL SECURITY                          :           DATE: AUGUST 22, 2011
                                                         :
--------------------------------------------------------- x

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER AND ON DEFENDANT'S MOTION TO AFFIRM THE
DECISION OF THE COMMISSIONER

        This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff child disability insurance benefits.

I.  ADMINISTRATIVE PROCEEDINGS

        On September 3, 2004, plaintiff David DeMarco applied as an adult for child disability

benefits, claiming that he has been disabled due to bipolar disorder, manic depression, and

high blood pressure, and has "never worked at gainful employment, other than with an

accommodation or subsidy." (Certified Transcript of Administrative Proceedings, dated

September 24, 2010 ["Tr."] 54, 74, 173; see Tr. 129-34).[1]  The Commissioner denied

plaintiff's application initially, and upon reconsideration.  (Tr. 65-68, 72-73; see Tr. 69-70,

100).

        On December 23, 2005, plaintiff filed a request for a hearing before an Administrative

_____

[1]In his initial application for DIB benefits, it is noted that plaintiff is "already on SSI[.]" (Tr.
54). Plaintiff applied for SSI on November 27, 2002, in which plaintiff claimed disability since
January 1, 1992 (Tr. 126-28; see also Tr. 135-37), and a "Review Statement" in support of such
application was filed on January 29, 2003.   Plaintiff's mother completed a Request to Be Selected
as Payee on September 3, 2004.  (Tr. 138-41).

Law Judge ["ALJ"] (Tr. 74-79, 94-95), and on February 1, 2007, ALJ Roy P. Liberman filed a Notice of Dismissal on grounds that plaintiff's request for hearing was filed by his attorney, but the request for a hearing was not signed by plaintiff and the file did not include an appointment of representative naming this attorney as plaintiff's representative. (Tr. 55-58). Thereafter, plaintiff's counsel submitted his documentation reflecting the appointment of representative (Tr. 83; see Tr. 14, 80-82, 103-05, 120-21), and his Request to Review Order of Dismissal. (Tr. 85-92, 97-98). Almost one year later, on February 8, 2008, the Appeals Council issued its Notice of Order of Appeals Council Remanding Case to the Administrative Law Judge. (Tr. 59-64; see Tr. 101-02).

On May 5, 2008, a hearing was held before ALJ Liberman, at which plaintiff, his brother, John DeMarco, Jr., and his mother, Rosemary DeMarco, testified, and at which counsel was present. (Tr. 14-53; see Tr. 106-19). Ten days later, ALJ Liberman issued his decision in which he concluded that plaintiff was not under a disability within the meaning of the Social Security Act prior to attaining age twenty-two. (Tr. 5-13). On July 18, 2008, plaintiff filed his Request for Review of the Hearing Decision. (Tr. 122-23). On June 2, 2010, the SSA issued its Notice of Appeals Council Action, denying plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4).

On July 23, 2010, plaintiff filed his complaint, pro se, in this pending action (Dkt. #1),[2] and on November 3, 2010, defendant filed his answer. (Dkt. #13).[3] After four sixty-

---

[2]Plaintiff commenced this action with a Motion for Leave to Proceed In Forma Pauperis, which on was granted on August 2, 2010. (Dkts. ##2, 7). Plaintiff also filed a Motion to Appoint Counsel on July 23, 2010, which was denied without prejudice to renew on August 2, 2010. (Dkts. ##3, 7).

[3]Attached to defendant's answer is a certified copy of the Administrative Transcript, dated September 24, 2010.

day motions for extension of time were granted by this Magistrate Judge, plaintiff filed a second Motion to Appoint Counsel on June 23, 2010, which was denied five days later by this Magistrate Judge.[4] (Dkts. ##15-25; see also Dkts. ##8 & 14). On July 8, 2011, plaintiff filed the pending Motion to Reverse or Remand the Decision of the Commissioner. (Dkt. #27). On August 19, 2011, defendant filed his Motion to Affirm the Decision of the Commissioner, and brief in support. (Dkt. #32; see also Dkts. ##29-31). On July 27, 2010 and again on June 28, 2011, this case was referred to this Magistrate Judge from United States District Judge Janet Bond Arterton. (Dkts. ##6 & 26).

For the reasons stated below, plaintiff's Motion to Reverse or Remand the Decision of the Commissioner (Dkt. #27) is denied, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #32) is granted.

## II. FACTUAL BACKGROUND

Plaintiff was born in 1959 and is fifty-two years old; he seeks disabled child's insurance benefits which are payable to a claimant over age eighteen if the claimant has a disability that began before attaining age twenty-two. (Tr. 10, 17-18, 22, 125; see also Tr. 54, 127; but see Tr. 124; 20 C.F.R. § 404.350(a)(5)). Plaintiff lives in his family home with his older brother and with his mother, for whom plaintiff cares by helping her out of bed, helping her with household chores, taking her shopping, preparing dinner and assisting her back to bed at night. (Tr. 22-23, 214-15, 231-32). Plaintiff's brother also helps "with everything[.]" (Tr. 231). Plaintiff did not attend special education classes in school, but he did not attend school regularly and "eventually drop[p]ed out" in the eleventh grade and later received his GED. (Tr. 23-24, 179-80 (emphasis omitted); but see Tr. 203 (reporting

_____

[4]Plaintiff filed an Objection to this Magistrate Judge's Ruling, which objection is pending before Judge Arterton. (Dkt. #28).

3

completing the twelfth grade)).[5]

In his application for benefits, plaintiff reported that his medication makes him "very sleepy[,]" he cannot concentrate, he cannot drive and he over eats. (Tr. 173 (emphasis omitted); see also Tr. 23, 178, 193, 233). Additionally, plaintiff reported that his "mental disability affects all aspects of [his] daily life[.]" (Tr. 189). According to plaintiff, his "inability to focus[, his] short attention span[,] and [his] compulsive behavior along with [his] low self esteem[,] reclusive tendencies[,] and constant need of approval and direction complicate [his] recovery process." (Id.). Specifically, plaintiff reported that he does not sleep well because he is afraid of what is happening with his parents,[6] he is "not happy very often" and is "not confident in [himself.]" (Tr. 193; see Tr. 240). In his application on appeal, plaintiff's mother reported that plaintiff had "ceased taking prescription medications for his conditions" because the "possible" side effects outweighed the benefits. (Tr. 190). At that time, plaintiff was trying Trileptal,[7] and his brother, who was studying to be a naturopath, was assisting

---

[5]In an unsigned note authored by his mother and attached to his application, his mother noted that plaintiff was bullied at school and left high school in eleventh grade, at which time his father told him to stay home "and rot" until he turned eighteen. (Tr. 204). His father "insult[ed] him in every way[,]" and plaintiff's over-eating became "more of a problem[.]" (Id.). His older brother encouraged him to finish school, which he did at age eighteen and with help from his brother, plaintiff got his first job in 1989 at Home Depot performing the "non skilled difficult labor[.]" (Id.). At the end of the year, a female co-worker asked plaintiff to talk to their supervisor as the supervisor was "making it difficult at work"; plaintiff left work and never worked at another job since then. (Tr. 204-05). According to his mother, plaintiff's father would tell plaintiff that he was not like other people, and when his father's contact got plaintiff a job in a mail room, plaintiff's father "cancelled that job" for plaintiff saying that the job was "not good enough" for plaintiff, and that plaintiff was an embarrassment to him. (Tr. 205). "After this episode, [plaintiff] lost all heart trying to do anything in the outside world again." (Id.).

[6]Plaintiff also reported that his parents were going through a trial (presumably for their divorce) at the time he completed his application for benefits, and that his symptoms were "[i]n [his] mind." (Tr. 193). Plaintiff's father died on May 7, 2003. (Tr. 132).

[7]Plaintiff also takes or has taken Paxil and Lorazepam (Tr. 240).

4

plaintiff for his mental disability. (Id.).[8] His mother added that plaintiff also needed "long term counseling which [was] currently beyond [their] financial abilities to provide for [plaintiff]." (Id.).

Plaintiff's mother completed a "Function Report -- Adult -- Third Party" on behalf of plaintiff, in which she reported that she spends every day with plaintiff, and in addition to assisting her with her personal and household needs, plaintiff cares for his own personal care, shops, prepares meals, cleans the house, performs repairs, mows the lawn, gardens, cuts wood, removes snow, takes out the garbage, and cares for the family pets. (Tr. 214-17, 232-33, 235). According to his mother, sometimes plaintiff needs help to do these chores if he is "physically ill or depressed[,]" and she handles the banking; "he never had to[ ]." (Tr. 217-18; see Tr. 235). For pleasure, plaintiff would walk "in the woods and bike ride[ ] with [his] brother[,]" and he would tend to the garden. (Tr. 218-19; see Tr. 236).[9] However, his mother also reported that plaintiff's ability to walk, squat, kneel, bend, stand, talk, concentrate, or get along with others is affected by his "weight problem and mental condition[.]" (Tr. 219, 237). According to plaintiff's mother, plaintiff follows written instructions and gets along with authority figures, but does not follow spoken instructions

---

[8]Plaintiff was also taking "[a]lternative [m]edications" including, green tea, eluthere, adrenal support, ginko biloba, mushroom complex, aged garlic extract, purified fish oil, cinnamon complex, kudyu, enzymes pre and probiotics, probiotic infused whole food multivitamin/mineral herbal complex, calcium complex, and vitamins E, C, B complex and B 12. (Tr. 284).

However, at the time of his hearing, plaintiff testified that he occasionally takes aspirin, and "probably some chamomile" but he does not take anything else. (Tr. 36). Plaintiff's brother testified that he has prescribed plaintiff to take the above-referenced "[a]lternative [m]edications" and plaintiff does take them despite his testimony to the contrary. (Tr. 45-46).

[9]In an undated and unsigned entry in his administrative transcript by plaintiff's brother, it was noted that plaintiff's day begins with a "vigorous [ninety] minute walk at Sleeping Giant State Park with his brother[,]" before breakfast and assisting his brother with caring for their elderly mother, which includes ninety minutes of preparing macrobiotic meals. (Tr. 277). Plaintiff assists in daily food shopping, preparing, and serving and cleaning up meals. (Id.).

well, nor does he handle stress or changes in routine well.  (Tr. 220, 238).   Additionally, plaintiff fears changes in his family (Tr. 220), he reported that he has lost a job because of problems getting along with people, and he gets "anxious and nervous" and "sometimes" has trouble remembering things.  (Tr. 238).

A. WORK HISTORY

According to plaintiff, he "never really worked[,]" although in 1989, he performed maintenance work at Home Depot for "about a year but had to stop working due to [his] condition."  (Tr. 173-74, 223 (emphasis omitted); see Tr. 24, 155, 158, 248, 250-51, 262).[10] In this job, plaintiff watered the plants, swept the floor, helped customers, and carried "big heavy bags of fertilizers, seeds, pots, gardening equipment, plants,[and] mulch," with the heaviest weight of one hundred pounds or more.  (Tr. 174; see Tr. 24, 26-27, 224, 250-51, 261)(emphasis omitted)).  Plaintiff frequently lifted fifty pounds of more, and he walked and stood for eight hours, stooped, kneeled, crouched, reached, and handled big and small objects for six hours, and climbed for thirty minutes in a typical work day.  (Tr. 174, 261).

In a Work Activity Report completed on September 12, 2005, it was noted that plaintiff "could not learn the complete requirements for the job" because of his mental disability, and as his coworkers advanced, plaintiff "regressed[.]" (Tr. 248).  Plaintiff became "a [t]arget of abuse by a former employee" and plaintiff was "emotionally overwhelmed and left the job."  (Id.).  It was noted that plaintiff received special work conditions, including that his "overall job duties were reduced approximately [seventy-five percent,]" and that he was hired as a favor to his father who was then the Building Inspector for the Town of North

---

[10]Plaintiff also reported that in 1977 and 1978, he worked as a paper stacker at a printing company, and in 1981, he worked for "Mason" carrying bags of concrete on a work site. (Tr. 257-60; see Tr. 157, 262).

Haven. (Tr. 250-51; <u>see also</u> Tr. 254, 262). Further, plaintiff "needed his parents['] assistance in all areas respective to and including acquisition of the employment and in return[,] all of his income went to his parents." (Tr. 250).

In a Report of Contact made by SSA on September 9, 2004, it was noted that plaintiff's claim was still being forwarded for a medical determination as the record relating to plaintiff's work history was "still being developed[.]" (Tr. 245)(emphasis omitted). It was noted that Home Depot was "not cooperating" regarding plaintiff's earnings or any subsidies,[11] and with plaintiff's earnings of $11,533.80, plaintiff earned substantial gainful activity, but "based on the [plaintiff's] allegations[,] we believe strongly that there is going to be a subsi[d]y . . . ." (<u>Id.</u>)(emphasis omitted).

B. PERSONAL STATEMENTS

In a letter dated April 27, 2006, Gloria Giano, the former secretary/office manager from 1983-2000 for plaintiff's father, the former Building Inspector for the Town of North Haven, wrote that plaintiff's father secured him his job at Home Depot and Giano would call Home Depot to monitor plaintiff's progress because plaintiff was "incapable of fulfilling all the aspects of his job . . . ." (Tr. 143, 264, 273). According to Giano, plaintiff was "continuously assisted in the limited duties he was able to grasp and has never worked in any gainful employment capacity." (<u>Id.</u>). Similarly, plaintiff's mother submitted an undated letter in which she recalled that plaintiff's father assisted plaintiff in getting his job at the Home Depot and plaintiff's father had a "special agreement on [plaintiff's] behalf with the then manager of Home Depot," which included hiring plaintiff on a "trial basis" with the "accommodation . . . of a job coach and training classes" and plaintiff's older brother would "monitor

---

[11]Plaintiff's counsel similarly had no success in retrieving any documents or information from Home Depot. (Tr. 95, 256).

[plaintiff] every step of the way which he did do." (Tr. 274). According to plaintiff's mother, plaintiff was "never happy[]" working, and he told her "over and over again how he felt not being able to do the job like everyone else could do." (Id.). A third letter from Annmarie Bogart, plaintiff's godmother, described plaintiff as "excitable [and] extremely distracted" as a teenager, such that he left high school without graduating in 1975, and in 1981 he reentered an adult education program which he finished two years later. (Tr. 275-76).

Plaintiff's older brother, John DeMarco, Jr., also completed a personal statement on plaintiff's behalf, attached to which was his impressive five page resume. (Tr. 278-83). According to plaintiff's brother, plaintiff would not have secured a "subsidized job" at Home Depot without his assistance and the use of their father's name, as plaintiff has "been diagnosed and adjudicated disabled with a bipolar disorder manifesting in his early teens." (Tr. 278). Also according to plaintiff's brother, plaintiff's job "duties were reduced by [seventy-five percent] to watering the plants and some light cleaning and under [his supervisor's] constant supervision and assistance[,]" and "he was continuously assisted in all his endeavors at Home Depot and has never worked in any gainful capacity." (Id.).

C. MEDICAL RECORDS

Plaintiff began seeing Dr. Douglas A. Berv of Atlantic Health Services, P.C., on October 23, 2002, who diagnosed plaintiff with major depression, severe and post-traumatic stress disorder. (Tr. 286-94, 311-12). Dr. Berv noted that plaintiff was anxious, feared being harmed by his father, had difficulty relating to others, and exhibited the following symptoms: anhedonia, loss of interest, low motivation and energy, poor concentration, nightmares, feelings of hopelessness and helplessness, blunted affect, impaired recent memory, but intact abstraction, judgment, insight and thought process. (Tr. 286-87, 291).

Plaintiff reported that he had been physically abused by his father and more recently, he was emotionally abused and subjected to verbal threats. (Tr. 290-91, 293). Plaintiff's parents were going through a divorce and there was a protective order in place but plaintiff's father was making threatening phone calls, stalking them, and physically abusing his mother. (Tr. 290-91). Plaintiff reported feeling depressed and/or anxious for at least a year. (Tr. 291). Dr. Berv assigned plaintiff a GAF of 35, and he questioned whether plaintiff had a borderline IQ and learning disability, as well as noted plaintiff's absence of work history. (Tr. 287, 293). Dr. Berv noted that he wanted to rule out developmental disorder, social anxiety, schizoid or other disorder, and he prescribed Lexapro and Klonopin. (Tr. 287, 293-94; see Tr. 197).

Plaintiff returned on November 15, 2002 with his mother and brother, at which time plaintiff was "no less depressed[.]" (Tr. 287, 294). Plaintiff had "bumped into his father [and that] made him upset." (Id.). Dr. Berv increased plaintiff's Lexapro, decreased his Klonopin, and added Lorazepam. (Tr. 287, 294). A month later, on December 13, 2002, plaintiff reported that his father was still harassing him and he was trying to obtain a restraining order. (Tr. 288-89). Plaintiff was not sleeping well, he was nervous during the day, and he was not taking the Lorazepam during the day; Dr. Berv noted "no improvem[en]t[,]" and he stopped the Lexapro, and started plaintiff on Paxil. (Id.).[12]

On January 14, 2003, Kevin Murphy, PhD, completed a Psychiatric Review Technique of plaintiff for SSA, in which he noted an assessment of Listing 12.04A and 12.06, evidenced by depressive syndrome with sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking, along with post-traumatic stress

---

[12]In a Report of Contact by SSA on January 7, 2003, it was noted that Dr. Berv last saw plaintiff on December 13, 2002, and his next appointment was scheduled for January 17, 2003. (Tr. 242).

disorder and social anxiety disorder.  (Tr. 296-310).  According to Dr. Murphy, plaintiff had moderate restriction in activities of daily living and marked difficulties maintaining social functioning, concentration, persistence or pace, along with one or two episodes of decompensation.  (Tr. 306).

In a letter to plaintiff's counsel dated June 12, 2005, Dr. Berv opined "within a reasonable degree of medical probability that [plaintiff's] diagnoses, including his [b]ipolar [d]isorder, low IQ, learning disorder, and personality disorder have caused him to be totally disabled since his teen years."  (Tr. 311).  According to Dr. Berv, plaintiff's psychiatric impairments caused marked impairment of understanding and memory, sustained concentration and persistence, social interaction, and adaptation, and based on the history provided by plaintiff's brother and godmother, and from his clinical evaluation, "it [was] clear that [plaintiff's] psychiatric problems and disability began at about age thirteen with the onset of significant behavior problems including distractability, inability to do school work, and eventually leading to his dropping out of school."  (Id.).  Dr. Berv further opined that plaintiff's bipolar disorder was not properly diagnosed at that time, and he only diagnosed it in May 2003 despite having treated him since October 2002. (Id.).  According to Dr. Berv, it is very common for this diagnosis to be missed, "especially in childhood[,]" but plaintiff's prognosis will remain the same and it was his opinion that plaintiff is "permanently totally disabled."  (Id.).

D. PLAINTIFF'S HEARING BEFORE ALJ LIBERMAN

On May 5, 2008, plaintiff, his mother, and his brother testified at his hearing before

10

ALJ Liberman. (Tr. 14-53). Plaintiff testified that he did not miss any time due to illness when he worked at Home Depot, and when asked if they subsidized him in any way, which the ALJ defined as provided him with help or support that others did not receive, plaintiff responded no. (Tr. 25). Plaintiff testified that there was "one time" that he "might have let a supervisor down because of not doing the proper amount of workload during [a] . . . shift[,]" and he had a "hard time" completing his workload. (Tr. 35). According to plaintiff, he might have overheard people saying that if his performance did not improve, he would be terminated, but he voluntarily left his employment because he "could [not] do the work anymore." (Tr. 25, 35-36).

Plaintiff testified that he thought he was disabled before age twenty-two because he "had a lot of friction with [his] father in schooling[,]" and he was "[q]uite confused and very aggressive to just get where [he] was supposed to be and do the right thing . . . ." (Tr. 27). Plaintiff's mother testified that her husband, plaintiff's father, was "always downing him[,]" "always criticizing him for something[.]" (Tr. 49-50). Plaintiff did not receive any medical treatment and although he has seen Dr. Berv for his "mental problems[,]" he did not begin seeing him until fairly recently. (Tr. 27-28). According to plaintiff, his symptoms, from which Dr. Berv diagnosed him with manic depression, existed "[q]uite the same[ ]" for the period in question, from 1979 to 1981. (Tr. 28). Plaintiff took prescribed medication from Dr. Berv for the period that he saw him, but he neither sees a psychiatrist now, nor does he take any medication. (Tr. 28-29).

During the relevant time period of 1979 to 1981, plaintiff would help his mother

around the house and perform the outside chores. (Tr. 29-30). Plaintiff would take care of his personal needs, but due to his history with his abusive father, plaintiff "ask[s] permission to do things that normally a person would just do[,]" like asking his mother or brother if he can go to the bathroom. (Tr. 30-31). Plaintiff opined that he could take care of "things on [his] own[]" and could live on his own if he had to. (Tr. 31). During the relevant time period, plaintiff would watch television, play outside, or ride his bicycle, and he testified that he did not have any other medical problems. (Tr. 32, 34). He did not have many people that he would "even consider [his] friends," and he never had a girlfriend. (Tr. 32). Plaintiff testified that he has never had a problem with drugs or alcohol and he smoked cigarettes. (Tr. 32-33).

Plaintiff's brother testified that in 1989, when plaintiff was having physical and emotional problems with their father, he felt that the newly constructed Home Depot would be "the last chance that [plaintiff] would have to be able to get a job, get some training and be able to provide for himself in the future." (Tr. 37-38). Plaintiff's brother "called the [store manager] . . . [who] agreed to an accommodation whereby [plaintiff], if he made an effort to learn and perform the job requirements . . . , they would give him assistance and they would send him to training classes." (Id.). He described plaintiff as "slow to learn[,]" with difficulty in comprehension and following directions. (Id.).[13] Plaintiff never wanted to work and his brother had to "force[ ] [him] literally." (Tr. 44, 49). Plaintiff's supervisors would advise plaintiff's brother that he was not able to perform his job; plaintiff was not able to

---

[13]Plaintiff's mother's testimony corresponded to her older son's account of how plaintiff secured this employment. (Tr. 48-49).

work the cash register, so he was assigned to a job coach and worked with her in the garden department.  (Tr. 40-41; <u>see</u> Tr. 43).  According to plaintiff's brother, plaintiff had some conflict with a co-worker who harassed him such that plaintiff "would [not] even go to the store anymore[,]" but it did not have any effect on plaintiff's mental capabilities.  (Tr. 41-43).  Plaintiff's mother testified that plaintiff told her he just did not want to go back to work, he could not do the job, it was too much for him that day, and he "quit right then and there."  (Tr. 51).

When asked why the family did not get plaintiff medical attention when he was younger, plaintiff's brother testified that it was "[t]otally impossible[,]" as their father was "very, very . . . closed minded to . . . a problem[,]" he would not "bring it out in the open[,]" and he completely controlled plaintiff's mind.  (Tr. 38-39).  Similarly, plaintiff's mother testified that she wanted to take plaintiff to see a psychiatrist, but her husband refused and would not allow it.  (Tr. 50).  According to plaintiff's brother, plaintiff's weight was a significant problem at that time -- he "probably" weighed about 250 pounds then, when he weighed about 280 pounds at the time of the hearing.  (Tr. 39).[14]

## III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.  Second, the court must decide whether the determination is supported by substantial evidence.  <u>See Balsamo v. Chater</u>, 142 F.3d 75, 79

---

[14]In an undated Disability Report, plaintiff's weight is recorded at 310 pounds.  (Tr. 172).

(2d Cir. 1998)(citation omitted).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See 42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.

See 20 C.F.R. § 404.1520(a).  If the claimant is currently employed, the claim is denied.  See 20 C.F.R. § 404.1520(b).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  See 20 C.F.R. § 404.1520(c).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.  See 20 C.F.R. § 404.1520(e). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity ["RFC"] by using guidelines ["the Grid"].  The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of

disabled or not disabled.  See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations).  A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  See 20 C.F.R. § 200.00(e)(2).  If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)(citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986)).

## IV.  DISCUSSION

A claimant is entitled to child's benefits on the earnings record of an insured person who is entitled to old-age or disability benefits, or who has died, if the adult applicant for child disability benefits had a disability that began before attaining age twenty-two.  20 C.F.R. § 404.350(a)(5).  In this case, plaintiff, who is an adult applicant seeking child disability benefits, alleges disability since January 1, 1973.  (See Tr. 8).  As stated above, as an adult applicant seeking child disability benefits on his deceased father's earnings record, plaintiff must establish that his disability began before attaining age twenty-two.  20 C.F.R. § 404.350(a)(5).  Plaintiff attained age twenty-two on April 17, 1981, the day before his twenty-second birthday.  (Tr. 10).  The ALJ found, and the record supports, that plaintiff

engaged in substantial gainful activity for a period of approximately one and one-half years from the beginning of 1989 to the early summer of 1990 while he was employed at Home Depot. (Tr. 10-11).[15]

Under 20 C.F.R. § 404.1573(c), if a claimant's past work was "done under special conditions, [the SSA] may find that it does not show that [the claimant has] the ability to do substantial gainful activity." At the administrative level, plaintiff presented three unsworn statements -- one from his mother, one from his brother, and one from a former co-worker of his father -- along with testimony at plaintiff's administrative hearing by his brother and mother, that plaintiff's brother secured plaintiff's employment for him, and Home Depot provided certain accommodations so that plaintiff could perform his job duties. However, the ALJ is correct in that the testimony of plaintiff's brother about what job duties plaintiff performed at work and what events transpired which ultimately led to plaintiff quitting his job is based on information and events to which plaintiff's brother has no personal knowledge. Similarly, the statement of the former co-worker of plaintiff's father that plaintiff

_____

[15]Plaintiff contends that the ALJ failed to "consult a medical professional when making a medical decision[,]" and there are "other legal issues submitted pending due process that restrict said process from viewing this claim in [its] entirety raising further questions as to insure the constitutional rights of the plaintiff/claimant will be upheld." (Dkt. #27). An ALJ "may" seek the assistance of a medical expert to evaluate plaintiff's records and determine the nature and severity of plaintiff's impairments during the relevant time period. 20 C.F.R. § 404.1527(f)(2)(iii)(emphasis added). The role of a medical expert is to "aid the ALJ in evaluating the medical evidence." Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 666 (8th Cir. 2003). However, plaintiff's impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's statement of symptoms[,]" 20 C.F.R. § 404.1508; see 20 C.F.R. § 404.1528, and there are no medical records during the relevant time period that establish that plaintiff was under a severe impairment. Thus, the ALJ's conclusion is supported by the record, or the absence thereof.

was "incapable of fulfilling all the aspects of his job . . . [,]" and that plaintiff was "continuously assisted in the limited duties he was able to grasp and has never worked in any gainful employment capacity" (Tr. 143, 264, 273), does not correspond with plaintiff's description as to why he left his job, namely that he was overworked, "just doing too many work projects for other departments when I was supposed to just be doing my own department." (Tr. 35). While there was testimony by his brother that plaintiff was the target of harassment from a co-worker, there is no evidence in the record that plaintiff was disciplined or criticized by his supervisor(s), or that he did not perform his job. Instead, as the ALJ accurately observed, plaintiff was the one who decided to leave the job on his own accord; plaintiff was not fired. (Tr. 11). Even giving the pro se plaintiff the benefit of the doubt, and assuming that his work was done under special conditions and that he was able to work only because of specially arranged circumstances, or that he was given the opportunity to work because of a family relationship, plaintiff's work at Home Depot "show[ed] that [plaintiff had] the necessary skills and ability to work at the substantial gainful activity level." 20 C.F.R. § 1573(c)(3) & (6).[16]

---

[16]Furthermore, and again giving the pro se plaintiff the benefit of the doubt, while plaintiff claimed in his 2005 Request for a Hearing Before an Administrative Law Judge that plaintiff's work was subsidized, there is no support for this in the administrative record. (Tr. 74). Under 20 C.F.R. § 404.1574(a)(2), work is considered "subsidized if the true value of [a claimant's work], when compared with the same or similar work done by unimpaired persons, is less than the actual amount of earnings paid to [the claimaint] for [his or her] work." At the hearing, the ALJ specifically asked plaintiff if Home Depot subsidized him in any way, which the ALJ defined as provided him with help or support that others did not receive, in response to which plaintiff stated no. (Tr. 25). Additionally, plaintiff reported that he performed the work of an employee in the garden department, short of operating the cash register, and he assisted other employees as necessary.

In light of the ALJ's supported conclusion that plaintiff engaged in substantial gainful activity, the ALJ then continued to assess whether plaintiff had a medically determinable impairment prior to the date that plaintiff attained age twenty-two. (Tr. 11-12). Under the second step of the five-step evaluation process, plaintiff must show that he has an "impairment or combination of impairments which significantly limits [the] physical or mental ability to do basic work activit[y] . . . ." See 20 C.F.R. § 404.1520(c). While the ALJ may consider plaintiff's symptoms, plaintiff must also establish that his impairment results "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory techniques." 20 C.F.R. § 1527(a)(citation omitted).

Further, as the ALJ properly noted:

> The essence of the testimony of the claimant, his brother, and their mother, is that the claimant was obese in his early years and abused and degraded by the father . . . . [(Tr. 27-28, 39, 49-50)]. As a result, the claimant allegedly developed significant emotional problems. The claimant testified that even today he must ask his brother or mother for permission to use the bathroom. [(Tr. 31)]. [Plaintiff's] brother[] testified that in his early years, the claimant was slow to learn and had difficulty following directions. [(Tr. 38)]. The claimant received no medical treatment during the relevant period and took no medication. [(Tr. 27-28, 38-39, 50; see also Tr. 34)]. In fact, the claimant did not begin medical treatment until many years later, apparently prevented from doing so by his father. [(Id.)]. Even then, the claimant admitted that he took medication for a short-time in recent years and then stopped, switching to "natural" medications, such as vitamins. [(Tr. 29; see Tr. 190).] The record also contains statements of other, including Annmarie Bogart, a family friend, but these provide nothing more than observations of the claimant's history without support from any medical records. [(See Tr. 275-76)].

(Tr. 11). Additionally, plaintiff's medical treatment records reflect only three appointments

19

with Dr. Berv -- October 23, November 15, and December 13, 2002.[17] (Tr. 286-94). Initially, Dr. Berv diagnosed plaintiff with major depression, severe and post-traumatic stress disorder. (Tr. 286-87, 290-94, 311). He questioned whether plaintiff had a borderline IQ and learning disability, and he noted that he wanted to rule out developmental disorder, social anxiety, schizoid or other disorder. (Tr. 287, 293-94; see Tr. 197). While Dr. Berv prescribed medication, plaintiff testified that he stopped taking it and uses only aspirin or natural medications.[18] In a letter to plaintiff's counsel dated June 12, 2005, Dr. Berv opined "within a reasonable degree of medical probability that [plaintiff's] diagnoses, including his [b]ipolar [d]isorder, low IQ, learning disorder, and personality disorder have caused him to be totally disabled since his teen years." (Tr. 311). Dr. Berv further opined that plaintiff's bipolar disorder was not properly diagnosed during plaintiff's teen years, and he only diagnosed it in May 2003 despite having treated him since October 2002. (Id.). Then, basing his opinion on "the history provided by his brother, and a letter from his [g]odmother, Annmarie Bogart," he concluded that "it is clear that [plaintiff's] psychiatric problems and disability began at about age thirteen with the onset of significant behavior problems including distractability, inability to do school work, and eventually leading to his dropping out of school." (Id.).[19]

---

[17]While there is a notation in a Report of Contact by SSA on January 7, 2003 that plaintiff's next appointment with Dr. Berv was scheduled for January 17, 2003, there are no further medical records reflecting continued treatment. (Tr. 242).

[18]See note 8 supra.

[19]Additionally, the assessment of Dr. Murphy, the SSA medical consultant, does not support a finding that plaintiff was disabled before he attained the age twenty-two. For plaintiff to be found disabled under Listing § 12.04 (affective disorder) or § 12.06 (anxiety related disorders), plaintiff must show at least two of the following: (1) marked restrictions in activities of daily living;

The ALJ's conclusion that "while Dr. Berv is a treating physician and his report may possibly serve to show that the claimant is 'disabled' at present and has been since at least October 2002, it is utterly inadequate to establish a disability more than 20 years earlier at a time when [plaintiff] was turning 22[,]" is supported by substantial evidence of the record. (Tr. 12)(emphasis in original).  Additionally, as the ALJ noted, while plaintiff left high school in the eleventh grade, he was able to complete his GED and he did perform substantial gainful activity from 1989 to 1990.  (Tr. 12).[20]  Even bearing in mind that plaintiff's father foreclosed plaintiff from the benefit of any mental health treatment, there are absolutely <u>no</u> records at all – whether from the various schools he attended or from his childhood pediatrician – suggestive of a disability starting at age thirteen; as previously indicated, the medical records here commence in October 2002.  (<u>See also</u> Tr. 187).  The medical evidence does not support a conclusion contrary to the ALJ's decision that plaintiff was not under a disability at any time prior to April 17, 1981, the date he attained age twenty-two.

## V. CONCLUSION

For the reasons stated above, plaintiff's Motion to Reverse of Remand the Decision

---

(2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.  On January 14, 2003, Dr. Murphy noted an assessment of Listing 12.04A and 12.06, evidenced by depressive syndrome with sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking, along with post-traumatic stress disorder and social anxiety disorder.  (Tr. 296-310). According to Dr. Murphy, as of that date, plaintiff had moderate restriction in activities of daily living and marked difficulties maintaining social functioning, concentration, persistence or pace, along with one or two episodes of decompensation.  (Tr. 306).

[20]Moreover, during the relevant time period plaintiff was, and is, able to care for all of his personal needs, in addition to caring for and assisting his mother.  (Tr. 22-23, 29-31, 214-17, 231-35).

of the Commissioner (Dkt. #27) is denied, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #32) is granted.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 22nd day of August, 2011.


 /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge